Filed 11/13/15  P. v. Sagote CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MIA SAGOTE,<br><br>        Defendant and Appellant. | A140689<br><br>(San Francisco City and County<br>Super. Ct. No. 204124) |

Appellant Mia Sagote was convicted, following a jury trial, of first degree murder, kidnapping, and robbery.  The jury also found true special circumstance allegations that the murder was committed to prevent the testimony of a witness and involved the infliction of torture.  On appeal, Sagote contends (1) the trial court erred in admitting evidence and instructing the jury on adoptive admissions; (2) the court erred when it instructed the jury on adoptive admissions with CALJIC No. 2.71.5, rather than CALCRIM No. 357; (3) Sagote was deprived of effective assistance of counsel to the extent that counsel failed to object or raise arguments when necessary; (4) there is insufficient evidence to support the robbery conviction; (5) the court erred when it refused to give the version of CALCRIM No. 706 requested by the defense regarding the jury's consideration of a witness's punishment; and (6) the court abused its discretion and violated Sagote's due process rights when it admitted evidence of prior uncharged crimes.  We shall affirm the judgment.

## PROCEDURAL BACKGROUND

On October 3, 2013, Sagote was charged by first amended information with second degree robbery (Pen. Code, § 211—count I);[1] murder (§ 187, subd. (a))—count II); kidnapping (§ 207, subd. (a)—count III); and conspiracy to commit kidnapping (§ 182, subd. (a)(1)—count IV). As to count II, the information alleged that the murder was committed to prevent testimony, pursuant to section 190.2, subdivision (a)(10); the murder was exceptionally depraved, pursuant to section 190.2, subdivision (a)(14); the murder took place while Sagote was engaged in kidnapping, pursuant to section 190.2, subdivision (a)(17)(B); and the murder involved the infliction of torture, pursuant to section 190.2, subdivision (a)(18).[2]

Count IV, conspiracy to commit kidnapping, was dismissed during trial, on October 23, 2013. The special circumstance allegation of commission of an exceptionally depraved murder was apparently dismissed as it was omitted from the jury instructions and the verdict forms.

At the conclusion of trial, on October 29, 2013, the jury found Sagote guilty of all remaining charges and found all of the remaining special circumstance allegations true.

On December 20, 2013, the trial court sentenced Sagote to life in prison without the possibility of parole plus a determinate term of three years. Sagote's motion for new trial was denied at the sentencing hearing.

Also on December 20, 2013, Sagote filed a notice of appeal.

## FACTUAL BACKGROUND

This case arises from the killing of Leslie Jill May, a homeless resident of the Tenderloin area of San Francisco, who was burned to death in a parking lot near San Francisco's Candlestick Park on January 12, 2007.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Sagote was originally charged by information on February 7, 2008. The first amended information was filed during trial to reflect that Sagote's codefendant, Leslie Siliga, had pleaded guilty to voluntary manslaughter, kidnapping, assault with a deadly weapon, and false imprisonment, and was no longer a codefendant.

*Prosecution Case*

San Francisco Police Officer Gary Peachey testified that he worked as a homeless outreach officer in the Tenderloin area of San Francisco. Peachey had known May for many years and had encountered her regularly in the area of Jones and O'Farrell Streets. He often found her in an alcove on the 500 block of Jones Street, often with other people. May had a longtime boyfriend named Ricky Smith. Peachey also had become familiar with Sagote, who was not a resident of the Tenderloin. Sagote had a boyfriend named Kalvin Parks, whose nickname was "Kip."[3] Peachey knew Leslie Siliga, whom he had arrested for selling base rock cocaine. He saw her occasionally in the Tenderloin, but less frequently than he saw Sagote.

About 3:00 p.m. on January 11, 2007, Peachey was on duty in the Tenderloin when he encountered May. She was lying in a fetal position on the southeast corner of Jones and O'Farrell. She had fluids coming from her nose and mouth, and appeared to be very ill. She mumbled to Peachey that she was "dope sick," which he understood to mean that, as a heroin addict, she was suffering from withdrawal. Peachey called an ambulance, and waited with May for 15 minutes, until it came.

Peachey also worked the following day, January 12, 2007. After receiving a call from another officer that morning, Peachey went to San Francisco General Hospital to look for May, but was told she had already left. Peachey then went to the 500 block of Jones Street, between O'Farrell and Ellis Streets, where May normally slept. He found her there at 8:30 a.m., sitting in an alcove of a doorway at 537 Jones Street. Peachey had a conversation with May, after which, at 8:51 a.m., he opened a criminal case, gave her a crime victim form, and told her to follow up with an inspector in the robbery detail. The crime May reported was "robbery with force." The morning of January 12 was the last time Peachey ever saw May. On January 17, a badly burned body, later confirmed to be that of May, was found near Candlestick Park. Sagote was arrested on January 23.

---

[3] In the record on appeal, Parks' first name is sometimes also written as "Kelvin."

3

Mark Shirley testified that he lived in an apartment on Jones Street between O'Farrell and Ellis. He had known May since 1989, and saw her regularly on Jones Street. On the afternoon of January 11, 2007, Shirley was looking out of his open kitchen window, sometime between noon and 3:00 pm., when he saw May standing next to a large dumpster that was approximately 8 feet tall and 24 feet wide. May was taking off her clothes, after which she handed them to a person who was with her. That person threw the clothes in the dumpster. May, who was now nude, then started running across the street and toward O'Farrell, eventually running inside of a barbershop. She looked frightened. The person May gave her clothes to was a Samoan female with a large build and long black hair. He did not see her face.

On February 1, 2007, Shirley told a police officer what he had seen and was shown a photographic lineup. He pointed to a photograph of Sagote; she might have been the Samoan female he saw with May, but he was not sure. He also pointed out a second photograph as possibly being that person. Shirley had seen Sagote on Jones Street near O'Farrell and Ellis many times before. He acknowledged that he was nervous about testifying because he was worried about his personal safety.

Cynthia Abrams testified that she had been a daily user of crack cocaine and alcohol for many years; she also sold drugs. She had been homeless and living in the Tenderloin, although at the time of trial she was not homeless and was receiving case management and support services. She still used drugs "every so often." Abrams met Sagote in 2003 or 2004, and started selling drugs for her on a daily basis. Sagote would give Abrams drugs and Abrams would give Sagote money for the drugs she sold. Sagote sometimes told Abrams to give drugs on credit to certain customers; Sagote would then collect the money owed. Abrams sold drugs with Sagote in the area "from Ellis to Leavenworth to like O'Farrell down Jones." Sagote had a boyfriend named Kip.

Abrams knew May from the street, and saw her every day in the Tenderloin. They were friends and smoked crack together. She also knew Siliga, with whom she sold drugs.

4

On January 11, 2007, Abrams was on Jones Street, selling drugs for Sagote, when she saw Sagote following May, who was walking up the hill on Jones. Sagote was calling to May, telling her to "come here," but May did not come to her. Abrams then went around the corner onto Ellis, but returned a short time later, and saw Sagote walking down Jones toward Ellis. Sagote was taking off her "burners," which were "like baseball batting gloves." Abrams asked, " 'What did you do?' " Sagote responded, " 'I stripped that bitch and throw, you know, I throw the bitch up against the wall and stripped the bitch and throw her clothes in the garbage can.' " Abrams then said to Sagote, " 'Leave that lady alone, you know, she did nothing to you.' And Sagote said, 'white bitch' and [we] went on about our business." Sagote sounded angry when she told Abrams what she had done to May.

That evening, after hearing that May had spoken to the police, Abrams called Sagote and told her that Officer Peachey had seen May naked and had filed a police report. Sagote responded, "well, I am not worried about her. I'll fix that bitch," and hung up the phone. Abrams never saw May again after that day. The next day, on January 12, 2007, Abrams was in her hotel room when she heard Sagote and "Leslie"[4] call to her, telling her to come down to go to work. Abrams did not respond, but looked out of a friend's window and saw Sagote and Leslie in Sagote's car.

Abrams continued selling drugs for Sagote and, on January 23, 2007, she and Sagote were riding bicycles on Ellis while selling drugs when the police came and arrested Sagote. A few weeks later, Abrams learned that Sagote had been arrested for the murder of May. Eventually, around March 22, 2007, Abrams decided to talk to the police about what she had seen and heard. It took her so long to come forward because she was selling drugs and was "iffy" about whether it was the right thing to do.

Abrams acknowledged that she had several arrests and convictions for selling drugs. She also acknowledged that she had lied at the preliminary hearing about the last time she had used drugs. She was telling the truth in her testimony at trial. Abrams was

---

[4] The "Leslie" Abrams mentioned was presumably Leslie Siliga.

5

currently prescribed an antidepressant and seizure medications. She had also reported to her counselor in the past that she heard voices and at times hallucinated. In January 2007, she had been told that she had schizophrenia. At the time of trial, Abrams was not taking any of her prescribed medications. Also, during the period in which Abrams sold drugs for Sagote, Sagote sometimes bought her food and paid rent for a place to spend the night. Abrams felt that Sagote should have paid her rent every night, but Sagote did not do so.

Siliga testified that she met Sagote in 2003. Siliga began selling drugs in the Tenderloin that year. She was arrested for selling drugs and was convicted of being an accessory to drug sales in 2004. Siliga did not know May personally, but saw her on the street and sold drugs to her.

Siliga was initially charged with the first degree murder of May, along with accompanying special circumstance allegations and other related crimes. In July 2013, she pleaded guilty to kidnapping, voluntary manslaughter, assault with intent to commit great bodily injury, and false imprisonment. As a result of her plea, she was to be sentenced to 14 years and 4 months in state prison. Before pleading guilty, she understood that, with the original charges, she was facing life in prison without the possibility of parole. As part of the plea agreement, Siliga agreed to tell the truth and, if she did not tell the truth, she understood that her plea deal could be revoked and she could again be facing life in prison without the possibility of parole. A consideration in making the plea deal was that she wanted to see her children outside of prison while they were still relatively young.[5]

Siliga began selling crack cocaine in the Tenderloin—on Ellis Street, between Jones and Leavenworth—after she lost her job in 2003. She initially worked alone, but in 2005, Sagote began giving her crack cocaine to sell, and she would give Sagote some money after she sold it. While selling drugs with Sagote, Siliga met Sagote's boyfriend, Kip. Kip would cook the crack cocaine they sold at his house in Patterson, California.

---

[5] At the time of trial, Siliga's two sons were 16 and 18 years old.

6

Sagote lived there too. Siliga sometimes visited the house and helped to bag up the crack cocaine. She sometimes brought her boys there too, and would stay overnight with Sagote and Kip. She went to the Patterson house about once a month.

On the early morning of January 12, 2007, Sagote called Siliga and asked her to help her find some "weed." Sagote arrived at Siliga's house at Geneva Towers after her boys had left for school; they usually left shortly after 8:00 a.m. Siliga, who was wearing "sweats and a hoodie" that day, called around, but could not locate any weed, They therefore decided to go to the Tenderloin to look for weed there. They drove in Sagote's black two-door compact car.[6] They stopped first at Turk and Taylor, where Sagote met someone to buy weed. After that, Sagote wanted to drive around to see if she could find anyone who owed her money.

Sagote drove down Geary, turned onto Jones Street, and pulled the car over near where May was on the sidewalk. Sagote told Siliga to roll down her window, which she did. Sagote then called May over and asked "why did she tell Peachey on her." May responded that "she did not tell Peachey on her." Sagote wanted May to get in the car so that they could go to the police station, "so she can clear her name." May repeatedly refused to get in the car even though Sagote kept insisting that she do so. Sagote then told Siliga to grab May and bring her into the car; Sagote sounded angry. May, who was "fragile," seemed scared. She tried to move away from the car toward other people who were seated in front of a building.

After Sagote told her to get May into the car, Siliga opened the car door and grabbed May's arm. Siliga "tried to bring her towards the door, but she was pulling away, and then [Sagote] reached over and pulled her in the back seat." May was wearing baggy clothing and Siliga remembered that her pants fell down, but Siliga was not sure if it happened while she was being forced into the car or later.

---

[6] At trial, Siliga identified Sagote's car in a series of photographs that the prosecutor showed to her.

Siliga then got back into the passenger seat and Sagote drove toward the police station. Siliga believed Sagote was going to park the car so that she could take May to the police station, but Sagote crossed Market Street and stopped at a gas station at First and Harrison Streets. No one had said anything since May, who was lying down on the back seat, got into the car. Siliga stayed in the car, but saw Sagote put gas in her car and go to the cashier to pay. When Sagote came back to the car, Siliga heard her open and close the trunk, but did not see what she did there. Nor did she see whether Sagote had anything in her hands when she returned from the cashier area.

When Sagote drove away from the gas station, she told Siliga in Samoan that "she was going to burn her." Siliga did not say anything in response. May was in the back seat saying that "she didn't tell Peachey on her." Sagote drove down Third Street near AT&T Park and past Mission Rock. She then turned left off of Third Street and onto Gilman Avenue. She continued to drive down Gilman and then around the end of Hunters Point Expressway before making a u-turn and going back on Gilman. She then made a right on Fitch Street and drove into the parking lot at Candlestick Park. After driving around the stadium, Sagote drove over a low hanging chain that was held up by cement barriers. Sagote parked near the bay, still inside the park, where there was a view of the East Bay.

Sagote got out of the car and dragged May out of the back seat. May, whose pants were falling off, was on her knees, while Sagote went toward the trunk. Siliga stayed in the passenger seat. She saw Sagote take a red or orange gasoline tank out of the trunk. Sagote poured gasoline over May, who was screaming and looked scared. Sagote came to the car and asked Siliga to look for a lighter. Siliga looked around for a lighter, but Sagote found a lighter herself, and lit a white sock or rag inside the car; the weather conditions were windy. Sagote then walked toward May who was near the rear of the car. Siliga, who was facing forward in the car, did not see Sagote throw the white cloth on May, but, from the side, she saw May's whole body catch on fire. Sagote was standing a few feet away from May. Siliga noticed that May's jacket was in the back seat. Siliga took the jacket out of the car, threw it at Sagote, and got back into the

8

passenger seat of the car. May was still on fire, and was crying and screaming. Siliga did not see what happened to the gas can or what Sagote did with the jacket. Sagote soon got back into the car and drove out of the park the same way she drove in. Neither Sagote nor Siliga said anything.

Sagote drove toward Doublerock, where Sagote's parents and younger brother, Sefo, lived. Sagote saw Sefo outside of someone's house, and she stopped and had a short conversation with him. Siliga stayed inside the car. She did not hear the conversation, but she saw Sefo shake his head "like he didn't believe what she just told him." Sagote got back into the car and drove to Sefo's house, where she got out of the car and went inside. Siliga got out of the car and stood outside of the house, next to the front door. After a few minutes, Sagote came out of the house. Sagote and Siliga got back into Sagote's car and left. Sagote then dropped Siliga off at Siliga's home. They had been out together for two or three hours.

During the time she knew Sagote, Siliga was aware that Sagote "really didn't like snitches." On January 12, 2007, while driving out to Candlestick Point with May, Siliga heard Sagote say, "Snitches go into ditches." After Sagote told Siliga that she was going to burn May, Siliga did not do anything because "I was terrified of her, and I was weak to do anything, because I was scared for my life too." Once she saw that Sagote was going to light May on fire, Siliga still did not do anything to stop Sagote because she was scared of her. After that day, Siliga and Sagote never discussed what had happened to May. Siliga was arrested on February 13, 2007. She was not initially truthful with police because she was scared.

On cross-examination, Siliga acknowledged that, after her arrest, she initially denied any involvement in the kidnapping or killing of May. But, during the interview with police, she became afraid of receiving the death penalty and never seeing her children again, and therefore told the truth. As on direct examination, Siliga testified on cross-examination that, when she entered a plea agreement, she understood that she would receive a sentence of 14 years 4 months in prison, and that she would be reunited

9

with her children when they were still in their 20s. Without the agreement, she would have been facing a possible sentence of life in prison without the possibility of parole.

Tina Irwin testified at the preliminary hearing on January 3, 2008, but died before trial. Her preliminary hearing testimony was read aloud during Sagote's trial. On Friday January 12, 2007, about 11:00 a.m., Irwin took the 38 Geary bus to Geary and Jones Streets, and then walked on the sidewalk down Jones Street toward O'Farrell. As she walked, she saw two people forcing a woman into a small, dark two-door car. The woman's pants and underwear were down around her ankles and a person sitting in the driver's seat reached over, grabbed the woman, and began pulling her into the back seat of the car while the second person was pushing her. Irwin did not see the face of the person sitting in the driver's seat, but could tell that it was a female because of the "body structure"; she could see that the person had breasts and long hair.[7] The second person pushing the woman was a young, heavyset Polynesian female; she was wearing a dark hoodie, i.e., a sweatshirt with an attached hood, and had a ponytail of long black hair.

The woman was eventually forced into the back of the car. Irwin could only see the legs and bottom of the woman whose pants were down around her ankles. She was yelling and trying to get away. Once Irwin heard her voice, she realized it was May. She knew May from the Tenderloin, and considered her an acquaintance. When Irwin and her two daughters would walk by May on the way to the store, May always had something kind to say about her daughters. Irwin passed within three or four feet of the car, but did not stop. She wanted to get home to her girls and did not want anything to happen to her. Irwin also saw three homeless people a few feet away in a doorway as she walked by the car. They were laughing and taunting. As Irwin arrived at the corner of Jones and O'Farrell, she saw the car go through the intersection on Jones toward Market Street.

---

[7] On cross-examination, Irwin testified that she did not recall telling police during a taped interview that she could not tell whether the person in the car was a female or a male. Nor did she recall recently telling a defense investigator who asked whether she recognized either of the people that "their faces are a blur."

10

At the preliminary hearing, Irwin identified Siliga[8] as the woman who was pushing May into the car. She had seen Siliga on the streets before, but did not know who she was. Irwin had also seen Sagote in the Tenderloin numerous times before January 12, 2007, but had never had any interaction with her.

Irwin reported what she had seen to the police about 10 or 12 days later, after she heard that May had been found murdered at Hunter's Point. Irwin was in the witness protection program at the time of the preliminary hearing and her rent and food expenses were now being paid for through that program. She did not want to testify at the preliminary hearing and was brought to court by the police.

Michelle Irwin[9] testified that on January 12, 2007, shortly after 4:00 p.m., she was walking her dog along a path near the water in a huge open parking area at Candlestick Point, as she had done the previous day, when she came upon a body on the path directly in front of her. She initially thought it might be a burned car transmission, but then saw that it was a human body that had been burned. She could see that it was a woman because there were no clothes on her lower body. The body was very petite, with incredibly thin legs; there were socks, but no shoes on the feet. Michelle Irwin ran back to her car and drove to the ranger station, where she reported what she had seen. She then went with a ranger to the scene and pointed out the body to him, after which he called 911.

Dr. Ellen Moffatt, assistant medical examiner for the City and County of San Francisco, testified that, on January 15, 2007, she conducted an autopsy on a body she later learned was that of May. The body was severely burned, without much skin left. There was still some scalp hair and skin on the top of May's feet that were not burned, as well as some clothing remnants. There was soot below May's vocal cords and in her lungs, which was a sign that she was alive during the fire. She had cocaine, cocaine

---

[8] At the time of the preliminary hearing, Siliga was still a codefendant in this case.

[9] We shall refer to this witness by her full name to distinguish her from Tina Irwin, another witness at trial.

11

metabolite, and methadone in her blood. Dr. Moffat concluded that May died as a result of her burns.

San Francisco Fire Inspector Eileen McCrystle testified that she observed the crime scene on the evening of January 12, 2007. Near the burned body, she observed a melted red plastic container, a small red container cap, a red butane lighter, and a remnant of burnt fabric. The plastic container smelled of gasoline. She also saw a white sock with a Nautica label on it, located a short distance from the body. She determined that the fire was intentionally set.

Michael Gaynor, a former San Francisco police officer, testified that, by January 17, 2007, police had a "pretty good idea" that the homicide victim was May. Sagote quickly became a suspect and was arrested on January 23. Gaynor also testified that he went to the gas station at First and Harrison where Siliga said Sagote had stopped for gas before she burned May. He purchased a red plastic gas can, which he compared to what was left of the gas can recovered from the scene; they appeared to be similar.

After Sagote was arrested on January 23, 2007, she was interviewed by Gaynor and San Francisco Police Inspectors Michael Philpott. A video recording of that interview was played for the jury at trial. In it, Sagote said that someone had told her that May had made a police report against her, for robbery. In late December, she asked May to get in her car to talk about what she had heard. May got into the passenger seat of Sagote's car and Sagote said they were going to the police station "so we can both get out and get this shit straight." As Sagote drove to the police station, May jumped out of the car at Turk and Jones Streets and ran away screaming. Sagote believed the police report was based on her having taken $10 out of May's hand a few days earlier as May got ready to buy drugs with it. Sagote said the money would go toward what May's boyfriend, Rick, owed her. This happened on Ellis near Jones Street. Sagote insisted that the day May jumped out of her car was the last time she saw May and that she would never kill anybody. She believed others might think she had killed May over a minor debt "[b]ecause I talk crazy to people, I don't let people disrespect me . . . ."

12

Following Sagote's arrest, police inspector Pauline Hnatow searched Sagote's black, two-door 1990 Mazda. Among the items seized were a black fleece glove, a black chenille glove, and a white Nautica sock, which was found on the floor of the back seat. Other items found in the car included a matchbook, a black hooded jacket, two cigarette lighters, a phone, and a cracked baseball bat. Hnatow also found more socks, a purse, a CD, and various papers inside a plastic bag.

Sergeant Eric Batchelder, who worked in the technical services unit of the San Francisco Police Department, testified as an expert in the area of communications, records, signaling, and mapping of cell phones and cell phone towers. He examined records from January 11 to January 12, 2007 for the cell phone registered to Sagote, and was able to determine the cell phone towers that were used for each call made or received on that phone.[10]

On January 12, 2007, a call was made at 9:13 a.m., using a cell tower on Taylor Street. The call ended at 9:14 a.m. at the Jones Street cell tower in the Tenderloin. At 9:45 a.m., a call was made using a cell tower at 450 Harrison Street, which was near the gas station at First and Harrison Streets. The next call was made at 9:54 a.m. using the same cell tower near the gas station and ended at 9:55 a.m. at the cell tower at 2601 Mission Street. This was consistent with movement of the phone from east to west. The next phone calls were a series of five calls beginning at 10:54 a.m. and ending at 11:17 a.m. All of these calls used the cell tower at 5700 Third Street. That tower was near both Candlestick Point State Recreation area and the Doublerock neighborhood where Sagote's family lived. In San Francisco, the usual limit on a cell phone's distance from a tower is three quarters of a mile to a mile and a half.

During Sagote's trial, the following testimony was presented regarding prior uncharged offenses Sagote had allegedly committed. Abrams testified that, in 2005 or 2006, while she was working for Sagote selling drugs, Sagote attempted to collect $80

---

[10] Dwight Nichelson, the custodian of records for Sprint Corporation, had already authenticated phone records for a phone number registered to Sagote.

that Abrams owed her. Abrams was at Turk and Taylor Streets when Sagote drove up in a van or truck and told her to get in the car. Abrams got into the back seat behind Sagote, who asked where her money was. When Abrams said she had paid her rent with it, Sagote took her to Third Street behind some factories in the Hunter's Point area. Sagote put her seat back so that it was pressing down on Abram's leg; Abrams could not move. Sagote asked again about her money and said "that if she didn't have love for me that she would split my wig" and "bust me in my head." Sagote then threw Abrams and some bags she had with her out of the car and left her there. Abrams found a bus and returned to the Tenderloin. Abrams eventually repaid Sagote the money she owed her.

Siliga testified that Sagote sometimes loaned drugs or money on credit to various people, and charged them interest. There was a man named "Shorty," whose real name was Byron, who sold drugs for Sagote. In early 2006, Shorty owed Sagote money. Sagote's boyfriend, Kip, drove Sagote and Siliga in an SUV to Shorty's hotel in the Tenderloin; Sagote was in the passenger seat and Siliga was in the back. When Shorty and a person named "Kizzy" came outside, Sagote told Shorty to get into the back seat. After Shorty and Kizzy got into the car, Kip drove to Mission Rock. On the way, Sagote asked Shorty for the money, but he did not have it. When they got to Mission Rock, Sagote told Shorty and Kizzy to get out of the car and start undressing. Sagote also got out of the car and, as they undressed, she examined their clothes to see if there was money hidden in them. When they were undressed down to their undergarments, Sagote "tossed the clothes as far as she can." Sagote then got into the car and they drove away, leaving Shorty and Kizzy behind.

On another occasion, sometime in 2006, Shorty again owed Sagote money. Sagote drove with Siliga to the Tenderloin in Sagote's two-door compact car. Sagote picked up Shorty, who sat in the back seat, and drove to an alley south of Market Street. Sagote then began punching Shorty while wearing baseball gloves. Siliga was standing on the sidewalk a few feet away from the car, and saw Sagote strike Shorty multiple times. Eventually, Sagote stopped beating him and he got out of the car. He had lumps

14

and bruises all over his face, and was bleeding. Siliga got back inside the car and Sagote drove away without Shorty.

"Skates" was another individual who sold drugs for Sagote in the Tenderloin. Sometime between 2005 and 2007, Skates owed Sagote money. Siliga was selling drugs on Ellis Street near Leavenworth when she saw Sagote and Skates across the street. Sagote told Skates "to undress, to get naked." After Skates got completely naked, Sagote "asked him to bend over and cough," which he did. Sagote then threw Skates' clothes in the middle of the street, after which Skates went and retrieved them.

"Unique Roberts" testified that, in 2003, she worked for Sagote in the Tenderloin, selling crack cocaine, which she also used herself.[11] On September 27, 2003, Sagote approached Roberts on Jones near Ellis, and asked, " 'Where is the money?' " She was referring to the fact that Roberts owed her $200. As Roberts reached into her pocket to get the money to give to Sagote, a man hit her from behind on the left side of her eye. Sagote then hit her three times on the side of her head with a long wooden stick, until the stick broke. The man was also continuing to hit her from behind. Roberts fell off the curb and both Sagote and the man began to stomp on her head. Sagote grabbed Roberts's purse, which was on her shoulder, and said, " 'Where is the money?' " Roberts wrapped her arm around her purse and Sagote let go. Sagote and the man continued to stomp on her head for a few minutes. After they stopped, Roberts got up and walked home. That night, Roberts went to San Francisco General Hospital, where she learned she had a double jaw fracture. She had several surgeries and was in the hospital for 20 days.

*Defense Case*

Dr. John Shields testified as an expert in the field of forensic psychology. Dr. Shields had reviewed the psychiatric and other records of Abrams beginning on January 18, 2007, as well as preliminary hearing testimony and witness interviews related to the present case. Dr. Shields understood from the records that Abrams's psychiatric

---

[11] Roberts, who was also referred to at times during trial by masculine pronouns, had prior arrests and convictions related to the possession and sale of crack cocaine, between 1999 and 2012.

history went back to about 1980, when she was 19 years old. When Abrams visited the Family Service Agency on January 18, 2007, her psychotic symptoms were not being managed. She was diagnosed at that time with schizophrenia and polysubstance abuse. Her symptoms included markedly impaired judgment and bizarre ideation. Dr. Shields explained that "[b]izarre ideation is similar to delusional thinking, which is maintaining ideas that have no basis in reality." Then, on February 1, 2007, Abrams described symptoms of "command auditory hallucinations," which involved hearing voices telling her what to do. Dr. Shields explained that schizophrenic patients might report a false memory with "complete conviction," and are more likely to "base their memory on hunches or gists," rather than on an independent recollection of the actual event.

Dede Johnson, who lived on Jones Street near Ellis in the Tenderloin, testified that she had known May very well; May was like a sister to her. In late January 2007, after May went missing, Johnson was at the corner of Jones and O'Farrell when she saw May's boyfriend, Rick, with another man. She overheard Rick say to the other man, " 'I'm not going to pay you no $300 no more. H**e** supposed to took [May] out and I wanted the job done and you didn't do it.' " The other man told Rick, " 'Hey man, I couldn't do it all the way right.' " Rick then said, " 'Maybe you can find somebody else to do it.' " Johnson reported what she heard to a police officer on January 27.

James Sanchez testified that, after his car ran out of gas between 10:00 a.m. and noon on January 12, 2007, he went to the gas station at First and Harrison Streets. He bought a red gas can with a little black nozzle, paying for it with his debit card.

Matt Fung, the owner of the gas station at First and Harrison, testified that the gas station stocked red gas cans. On January 12, 2007, a gas can was purchased with a debit card. He did not have records for any cash purchases of a gas can on that date because such records were disposed of after approximately one year.

Cherisse Boland, a criminalist with the San Francisco Police Department's crime lab, testified that she had tested the gas cap found at the crime scene for DNA. The results showed that there was a mixture of DNA on the cap from at least two individuals, neither of which was Sagote or Siliga. One of the DNA donors appeared to be male,

16

though that could have been the result of transfer at the gas station or from someone wearing gloves.

## DISCUSSION

### I. *Admission of Evidence and Instruction on Adoptive Admissions*

Sagote contends the trial court erred in admitting recordings of three jailhouse phone calls and instructing the jury on adoptive admissions. She first claims that the predicate statements—in two phone calls with her boyfriend, Kalvin "Kip" Parks, and in one call with her brother, Sefo Sagote—were insufficient to qualify as adoptive admissions because they did not accuse her of criminal behavior. She also claims that the court's instruction on this issue, using CALJIC No. 2.71.5, violated due process because it did not effectively convey to the jury that it must disregard these statements "unless it unanimously found beyond a reasonable doubt that Sagote heard the statements and knew that they constituted an accusation of a crime, and had the ability to respond."

### A. *Trial Court Background*

#### 1.

Defense counsel objected on hearsay grounds to admission of statements from a phone conversation Sagote had with Parks on January 3, 2007, shortly after she was taken into custody. In particular, counsel argued that Sagote's statements did not constitute adoptive admissions. The trial court found the conversation admissible, explaining that "what the jury is going to hear Parks say is that he is essentially coaching Sagote how she should be approaching a police interview. And to also adopt something that they both know not to be true, which potentially is that May jumped out of the car. And that's something which then turns up actually repeatedly in the interview which occurs minutes after this interchange.

"I do agree that you have to play [the] DVD from the beginning, because there is so much of it which is unintelligible, large gaps[,] Sagote talking about some things that might be incriminating, and she is also talking about some things that are of a mundane

17

nature." The court later denied Sagote's motion for new trial on this issue. The challenged statements were as follows:[12]

"Sagote:  I'm sitting in a room waiting for somebody come talk to me.

"Parks:  I told you that's what they were going to do, [unintelligible]. [unintelligible]  Don't say you went back to fucking Doublerock, because they are going to be able to look on a itinerary, and see who went, and see if you come through that gate. Now after [May] jumped out the car, you went [unintelligible] house in Sunnydale. [unintelligible]  Don't say you went back to Doublerock, cuz you know security guard, [unintelligible] they go back and look at that log and see when you come through that gate.

"Sagote:  Yeah.  He knows me."

**2.**

Sagote objected to admission of statements from another phone conversation she had with Parks following her police interview, also on hearsay grounds, again arguing that her statements did not constitute adoptive admissions. The trial court excluded a portion of this conversation as irrelevant and unduly prejudicial, but admitted another portion, stating that the first part of it "places into context who is speaking, the subject matter of what they are talking about. And it also explains the last portion, which I believe is an adoptive admission where Parks is talking about his efforts to deny law enforcement from gaining potential inculpatory evidence from the Patterson Street [*sic*] address.

"Specifically . . . , Parks is indicating that he's being asked whether or not he lives at Patterson, and he is going to deny that he lives there, which is consistent with what he's saying to Sagote that they both should be denying some connection to the place, and

_____

[12] These statements were recorded while Sagote was talking on her cell phone in an interrogation room at the police station, waiting to be interviewed. Due to the poor quality of the recording, the trial court admitted the video recording without a transcript. Here, we quote the transcription contained in Sagote's pretrial motion in limine. The transcription does not contain other portions of the conversation, which, based on the trial court's comments, presumably include references to May jumping out of Sagote's car.

in the event that the police try to establish connection he is going to make sure that they can't do that by disposing of her clothing two doors down in the garage [*sic*].

"So it was clear in my mind . . . that everything was going to come in and going to end when Sagote said 'talking too much, they—' to Parks." The court subsequently denied Sagote's motion for new trial on this issue.

The admitted portion of the conversation began with Sagote and Parks exchanging information learned during their separate police interviews:

"[Parks]: . . . They was like, well do you live in Patterson on Jake Creek and all this and that. I'm like, nah man, my uncle live out there. Sometime I go visit.

"Sagote: Yeah, they gonna pull out both—both of my I.D.'s.

"Parks: What I.D.?

"Sagote: My other I.D.

"Parks: Capisilia [*sic*].[13]

"Sagote: I guess. Yeah they was like, ah—

"Parks: What you walkin' around with that for?

"Sagote: No, they pulled it out like you know, a copy of it.

"Parks: Oh. Oh.

"Sagote: So it was like yeah, um, we're gonna look into your life. Like what the fuck. Okay, well what the fuck did I do?"

The admitted statements to which Sagote specifically objected followed:

"Parks: They talked—they goin' to get a search warrant and try to search my house in Patterson. I know that. I heard him talking but he didn't now I was still in the hallway. He's like, man, I'm fittin' to go get a search warrant so we can search this house right here. He was talkin' about Patterson though. I know that 'cause ah, 'cause her name is on there (Capisilia) so they feel like they come search that with a search

---

[13] "Capisilia" appears to have been an erroneous transcription of "Tapusilia," which was the first name on a letter addressed to Sagote that was found at the Patterson address.

warrant tryin' to find evidence, a gas can or some—anything. So I'll be at home tonight. I'm gonna throw all that shit in the garbage two doors down, all your clothes—

"Sagote: Talkin too much. They"

### 3.

Finally, Sagote objected to admission of statements, some of which were in Samoan, from a phone conversation she had with her brother Sefo Sagote from her jail cell on the ground that Sefo's statements were hearsay and Sagote's statements were inadmissible because the translating officer was not a certified interpreter. The trial court found that the translating officer, Maina Tuimavave, was an expert in translating from Samoan to English. It therefore permitted the prosecutor to introduce the statements at trial as adoptive admissions. The court also denied Sagote's motion for new trial on this issue, in which she challenged only Officer Tuimavave's qualifications as an interpreter. The admitted statements included the following exchange in Samoan:

"Female: You go and call[.]

"Male: Tell the person what?

"Female: Tell the person, that I was the only one in the car. . . ."

Then, during a portion of the conversation that was in English, the following exchange took place:

"Male: Well what happened to (inaudible)?

"A: They took it.

"Male: I told you.

"A: Yep, they took it.

"Male: You should have let me have that car.

"A: I was like, man, I don't give a fuck what kinda test you gotta do to that shit. Do whatever you got to do. . . .

"Male: They got a hold on it? [¶] . . . [¶]

"A: They ah, got it in forensics.

"Male: Damn.

"A: Yep. . . ."

20

Finally, the statements challenged by Sagote, translated from Samoan to English, were as follows:

"Female: Where is are [*sic*] the cameras you were saying are down by the park?

"Male:  What?

"Female: Where are the cameras you were saying are down by the park?

"Male:  They were at the area where you were.

"Female: They were down there?

"Male:  Yes[.]

"Female: Where are the cameras?

"Male:  They are directly where you were at.  In the round/cylinder things.

"Female: They are facing the area where I was at?

"Male:  Yes[.]"[14]

### B. *Legal Analysis*

Sagote now argues that these three conversations were improperly admitted because they did not qualify as adoptive admissions.

Pursuant to Evidence Code section 1221, " '[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.' "  Hence, " '[w]hen a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it.  [Citations.]  His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.' "  (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 (*Riel*).)  Moreover, "a direct

---

[14] Officer Tuimavave, who translated the recording of this call from Samoan to English, testified at trial that, after listening to the tape—which was difficult to hear—multiple times, she had corrected an earlier translation of Sefo's second statement from "The cameras where you went that night" to "They were at the area where you were." Due to the poor quality of the tape, she initially thought she heard the word "night," which, on further review, she realized was not in the recording.

accusation in so many words is not essential." (*People v. Fauber* (1992) 2 Cal.4th 792, 852 (*Fauber*); accord, *People v. Geier* (2007) 41 Cal.4th 555, 590 (*Geier*).) To warrant admission under Evidence Code section 1221, " 'it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' [Citation.]" (*Riel*, at pp. 1189-1190, quoting *People v. Edelbacher* (1989) 47 Cal.3d 983, 1011.)

In *Fauber*, *supra*, 2 Cal.4th at page 852, our Supreme Court discussed *People v. Preston* (1973) 9 Cal.3d 308 (*Preston*), as an illustration of the point that a direct accusation is not required for the adoptive admission exception to apply. In *Preston*, a witness testified about a conversation she had heard between the defendant, who was charged with killing the witness's mother and stepfather, and his coperpetrator, in which the coperpetrator told the witness that " ' "we" ' " had broken into her mother's trailer and " ' "they came in, and there was an accident . . . but they won't talk." ' " (*Fauber*, at p. 852, quoting *Preston*, at p. 314.) The defendant then looked at the witness and said, " ' "There wasn't much money." ' " (*Fauber*, at p. 852.)

The *Fauber* court explained: "Although the statements were not accusatory on their face, we concluded they accused the defendant of being in the victims' trailer with the coperpetrator when the killings took place. We noted the statements were voluntarily made in the course of a private conversation in a private home. These circumstances supported the inferences that the defendant heard and understood the statements and had the opportunity to deny them, and that he chose to remain silent except for an evasive and equivocal statement." (*Fauber*, *supra*, 2 Cal.4th at p. 852.)

In *Riel*, *supra*, 22 Cal.4th at page 1189, the defendant argued that a witness's recounting of one suspect's incriminatory statements about something "they" had done, made in the presence of the defendant and another suspect, might have been referring to the actions of the two other suspects only, not the defendant. The California Supreme Court stated: "If [the first suspect] had referred only to himself [and the other suspect], one would expect defendant to have clarified that the statements did not include him.

22

The circumstances warranted presenting the evidence to the jury and letting the jury decide what weight to give it." (*Ibid*.; accord, *Fauber*, *supra*, 2 Cal.4th at pp. 851-852 [adoptive admission found where witness heard defendant and two other men discussing need to "get rid of his body," though witness was not sure who had said what during conversation].)

In the present case, Sagote asserts that none of the admitted predicate statements constituted an accusation that Sagote had committed a crime. Regarding the second conversation with Parks, she asserts that Parks' statement that he was going to throw away Sagote's clothes was " 'arguably *incriminatory*, but . . . not *accusatory*.' " We disagree. Parks' statement about throwing Sagote's clothes "in the garbage two doors down," supported a reasonable inference that he planned to destroy evidence linking Sagote to the crime, with Sagote's response—that Parks was "[t]alkin too much,"—an expression of concern that their conversation was being monitored. (See *Riel*, *supra*, 22 Cal.4th at pp. 1189-1190.) That the statement did not directly accuse Sagote of a crime is irrelevant. (See *Fauber*, *supra*, 2 Cal.4th at p. 852.) Moreover, Sagote's argument that the jury could have found that her response was merely an attempt to get her "motormouth boyfriend" to be quiet did not render the conversation inadmissible. Rather, Sagote's "observations go to the weight rather than the admissibility of" the statements. (*Fauber*, at p. 853.) The meaning of Parks' statement and Sagote's response was for the jury to decide. (See *Riel*, at pp. 1189-1190.)

Likewise, Parks' instructions to Sagote not to say she went back to Doublerock because the security guards would have a log of who entered at what time, but to say instead that she went to Sunnydale, and her response that the security guard "knows me" supported a reasonable inference that Parks was coaching Sagote to present a false alibi. Again, it was for the jury to determine whether Sagote's statement constituted an adoptive admission. (See *Riel*, *supra*, 22 Cal.4th at pp. 1189-1190.)

23

The trial court also properly admitted Sagote's phone conversation with her brother, Sefo.[15] Sagote's responses to Sefo's description of cameras "at the area where you were"—specifically her questions about whether the cameras were "down by the park" and "facing the area where I was at"—placed Sagote at the crime scene and could have shown consciousness of guilt. Once again, Sagote's argument that "nothing Sefo said constituted an *accusation* that Sagote had been involved in any crime" is misplaced. (See *Fauber*, *supra*, 2 Cal.4th at p. 852.) Sefo's statements and Sagote's responses supported a reasonable inference that Sagote was expressing concern about the crime being recorded by cameras at the scene. (See *Riel*, *supra*, 22 Cal.4th at pp. 1189-1190.) Furthermore, whether Sagote's responses constituted adoptive admissions or whether, instead, they merely reflected that she had "undoubtedly visited the crime scene after the news of the murder by burning became public," as Sagote asserts, was for the jury to decide. (See *ibid*.)

Finally, Sagote argues that the court erred when it failed to inform the jury that it had to be convinced beyond a reasonable doubt that Parks' and Sefo's statements were accusations and were understood by Sagote to be accusations, and that Sagote intended her response to constitute an admission. According to Sagote, "[t]his is required as part of the constitutional obligation to instruct on proof beyond a reasonable doubt as to each element of the crime, and by Evidence Code section 403, which requires the court to instruct on request that the jury is to determine the truth of preliminary facts before it may consider evidence that is otherwise barred by the rules of evidence."[16]

<hr/>

[15] Respondent argues that Sagote forfeited the claim regarding her conversation with Sefo because defense counsel did not object on this ground in the trial court. Giving Sagote the benefit of the doubt, we shall address that claim on the ground raised on appeal.

[16] Evidence Code section 403, subdivision (a)(1) provides that, when "[t]he relevance of proffered evidence depends on the existence of a preliminary fact," the proponent of that evidence "has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact." Subdivision (c) of section 403 provides in relevant part: "If the court admits the

24

First, the trial court *did* instruct the jury on adoptive admissions, in conformity with the requirement of Evidence Code section 403, subdivision (c)(1). Pursuant to CALJIC No. 2.715, the court told the jury that it had to find certain preliminary facts to be true before it could consider the evidence in question adoptive admissions. Specifically, the instruction provided that only if the jury found that there was an occasion when Sagote "(1) under conditions which reasonably afforded her an opportunity to reply; [¶] (2) failed to make a denial or made false, evasive or contradictory statements, in the face of an accusation, expressed directly to her or in her presence, charging her with the crime for which [she] now is on trial or tending to connect her with its commission; [¶] and [¶] (3) that she heard the accusation and understood its nature," could that "silence and conduct" be considered an admission that the accusation was true.[17]

Second, Sagote provides no persuasive authority that an instruction on adoptive admissions, which does not pertain to the elements of a crime, requires that the jury be told that it must be convinced beyond a reasonable doubt that the statements constituted adoptive admissions. Neither Evidence Code section 403 nor CALJIC No. 2.71.5—which has been cited with approval by our Supreme Court—include such a requirement. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1120, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151 [where relevance of evidence depends on the existence of a preliminary fact, under Evidence Code section 403, subdivision (a)(1), "the trial court must determine whether the evidence is sufficient for a trier of fact to reasonably find the existence of the preliminary fact by a preponderance of the evidence"]; see also *Geier*, *supra*, 41 Cal.4th at p. 589 [CALJIC No. 2.71.5 "reflects the

proffered evidence under this section, the court: [¶] (1) [m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist."

[17] Respondent points out that defense counsel requested that the court instruct with CALJIC No. 2.71.5. Respondent asserts that, therefore, any error in giving this instruction was invited and that Sagote has therefore forfeited this issue. Even assuming that the issue is not forfeited, we find it to be without merit, as we shall explain.

adoptive admission exception to the hearsay rule"]; *People v. Carter* (2003) 30 Cal.4th 1166, 1198 [holding that trial court must give CALJIC No. 2.71.5 only when defendant requests it].)

In sum, each of the three challenged conversations satisfied the threshold for admissibility under Evidence Code section 1221, and the court properly instructed the jury regarding how it should evaluate this evidence. (See *Riel*, *supra*, 22 Cal.4th at pp. 1189-1190; *Edelbacher*, *supra*, 47 Cal.3d at p. 1011; CALJIC No. 2.71.5.)[18]

## II. *Instructing the Jury on Adoptive Admissions with CALJIC No. 2.71.5 Rather Than with CALCRIM No. 357*

Sagote contends the trial court erred when it instructed the jury on adoptive admissions with CALJIC No. 2.71.5, rather than CALCRIM No. 357. Sagote claims there was crucial language in CALCRIM No. 357 that the jury should have heard, which concerned the requirement that the jury find that "[t]he defendant would, under all the circumstances, naturally have denied the statement if (he/she) thought it was not true . . . ."

We will not address this claim on the merits because we agree with respondent that defense counsel invited any possible error by requesting that the court give CALJIC No. 2.71.5 instead of CALCRIM No. 357.

" 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule. [Citations.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 (*Coffman*).) In *Coffman*, at page 49, the California Supreme Court found

---

[18] Because we conclude the court correctly admitted and instructed the jury on the evidence in question, we need not address Sagote's claim of ineffective assistance of counsel.

invited error where defense "counsel did not merely acquiesce, but affirmatively joined in [codefendant's] challenge to Prospective Juror B., and thus cannot be heard to claim the court erred in excusing her." (Accord, *People v. Seaton* (2001) 26 Cal.4th 598, 668 [finding that "defendant invited any conceivable error in giving these instructions because he asked the trial court to give them"].)

In the present case, the record reflects that defense counsel expressly requested that the trial court give CALJIC No. 2.71.5. During a discussion of jury instructions with the prosecutor and defense counsel, the court stated: "There was an extensive discussion about which particular instruction more accurately summarized the law, CALCRIM No. 357 or CALJIC No. 2.71.5. And that was at the suggestion of the defense. [¶] I think the People prefer that the court give CALCRIM No. 357. In my review of this, I believe that the CALJIC instruction more accurately . . . characterized the state of the law in terms of an adoptive admission." The court then permitted the prosecutor to "make [his] record on this," and the prosecutor responded, "as the court knows that we respectfully disagreed and was asking for 357, because I think 357 encompasses much more wider type liability which the case law has recognized."

Although the reason for defense counsel's request was not stated on the record, the fact that he affirmatively asked the court to give CALJIC No. 2.71.5 over CALCRIM No. 357 demonstrates a "clearly implied tactical purpose," which is "sufficient to invoke the invited error rule." (*Coffman*, *supra*, 34 Cal.4th at p. 49.) Consequently, Sagote cannot now claim the court erred in instructing the jury with CALJIC No. 2.71.5 instead of CALCRIM No. 357.

Sagote contends that, to the extent her claim of error is precluded because defense counsel invited the trial court's error, counsel's representation was inadequate.

To prove ineffective assistance of counsel, a defendant must show that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.) In addition, the defendant must affirmatively establish prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

27

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.)

Here, Sagote has provided virtually no argument in support of her ineffective assistance of counsel claim. In her opening brief, she merely sets forth the general law regarding ineffective assistance of counsel and then states, "Here, there is no discernible tactical reason for failure to take all steps necessary to preserve the evidentiary, instructional, and [c]onstitutional issues made in parts I and II of this brief [regarding the admissibility of evidence of and instruction on adoptive admissions]; the same is true of any defect in [the subsequent arguments made in] this brief." Because Sagote has provided no specific argument to support this broad assertion, we decline to address her ineffective assistance of counsel claim. (See, e.g., *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237; *Associated Builders & Contractors, Inc. v. San Francisco Airports Commission* (1999) 21 Cal.4th 352, 366, fn. 2; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)[19]

### III. *Sufficiency of the Evidence of Robbery*

Sagote contends there is not substantial evidence to support the conviction for robbery. She argues that the evidence was insufficient to show either that (1) she took money from May on January 11, 2007, the date alleged in the information, or (2) that she took May's clothing on that same date with the intent to permanently deprive her of her possession. Because we conclude there was substantial evidence to support the robbery

---

[19] We also observe that Sagote's ineffective assistance of counsel claim would fail in any event. The prosecutor explained in detail the various reasons he believed CALCRIM No. 357 should be given, all of which were favorable to the prosecution's position. Given the prosecutor's belief that CALCRIM No. "357 encompasses much more wider type liability which the case law has recognized," defense counsel was not unreasonable in preferring an instruction that would contain arguably greater limitations. In addition, as previously noted, the California Supreme Court has referred to the use of CALJIC No. 2.71.5 with at least implicit approval when discussing adoptive admissions. (See *Geier*, *supra*, 41 Cal.4th at p. 589; *People v. Carter*, *supra*, 30 Cal.4th at p. 1198.) For these reasons, Sagote could not show ineffective assistance of counsel even if the issue were not forfeited. (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 688.)

28

conviction based on the taking of May's clothes, we need not address whether there was also substantial evidence that Sagote took money from May on January 11, 2007.

Although the information referred only to the taking of "personal property, to wit: U.S. currency," Sagote does not claim that she did not have notice that clothing could be the type of property allegedly taken from May. In fact, at the preliminary hearing, the prosecution presented evidence that May's clothes were taken; the verdict forms described the items taken as "U.S. currency or personal property"; and the prosecutor referred to the taking of May's clothing in his closing arguments. Sagote's argument is that "only speculation supports the supposition that Sagote had the intent to permanently deprive May of her clothing."

" ' "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." ' " (*People v. Hill* (1998) 17 Cal.4th 800, 848–849 (*Hill* ).) We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Rayford* (1994) 9 Cal.4th 1, 23, disapproved on another ground in *People v. Acosta* (2002) 29 Cal.4th 105, 120, fn. 7.) "When undertaking such review, our opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment." (*Hill*, at p. 849.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "Theft and robbery have the same felonious taking element, which is the intent to steal, or to feloniously deprive the owner permanently of his or her property. [Citation.] [Our Supreme Court has] held that the intent to deprive permanently is satisfied by the intent to deprive temporarily but for an unreasonable time so as to deprive the person of a major portion of the value or enjoyment. [Citation.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1117.)

29

"The California statutes defining larceny and robbery (§§ 484, 211) do not require that the taking be for the purpose of gain, and we decline to read such a requirement into their plain terms: if the defendant intends to permanently deprive the owner of his property, the taking is larceny or robbery within the meaning of the Penal Code even if the defendant's sole intent is to destroy the property." (*People v. Green* (1980) 27 Cal.3d 1, 58, overruled on another ground in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3.)  In addition, "[c]ommon law and California cases . . . establish that an intent to steal will be recognized when personal property is dealt with in such a way as to create an unreasonable risk of permanent loss." (*People v. Zangari* (2001) 89 Cal.App.4th 1436, 1446.)  " ' "[I]ntent is inherently difficult to prove by direct evidence.  Therefore, the act itself together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred." [Citation.]' " (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1469; accord, *People v. Deleon* (1982) 138 Cal.App.3d 602, 606.)

Here, the evidence in the record supports the jury's finding that Sagote intended to permanently deprive May of her clothes when she stripped her and threw her clothes into the dumpster.  The evidence shows that Sagote did not merely take the clothes from May and drop them on the ground; she took the extra step of throwing them away in a large trash receptacle, from which they would be difficult for the frail May to retrieve, and where they also could be rendered unusable by contact with the contents of the dumpster. (See *People v. Zangari*, *supra*, 89 Cal.App.4th at p. 1446 ["intent to steal will be recognized when personal property is dealt with in such a way as to create an unreasonable risk of permanent loss"]; accord, *People v. Green*, *supra*, 27 Cal.3d at p. 58.)

Testimony that May was seen running naked down the street immediately afterwards and that the pants she was wearing the next day were so loose they slipped down to her ankles provides further indirect evidence that Sagote intended that May not regain possession of her clothes.  In addition, Sagote's intent can be reasonably inferred from evidence showing that she desired to punish and humiliate May by taking her

clothes. As Abrams testified, Sagote said she had "stripped the bitch and throw[n] her clothes in the garbage can." It was for the jury to determine Sagote's intent from the circumstances, and it reasonably inferred from this evidence that Sagote had the requisite intent. (See *People v. Smith*, *supra*, 64 Cal.App.4th at p. 1469; *People v. Deleon*, *supra*, 138 Cal.App.3d at p. 606.) While it is possible that Sagote had a different or additional intent when she took May's clothes and threw them in the dumpster, that does not negate the existence of substantial evidence of an intent to permanently deprive May of her clothing. (See *Hill*, *supra*, 17 Cal.4th at p. 849.)[20]

Because the record, reviewed in the light most favorable to the judgment, contains evidence from which a rational trier of fact could have found Sagote guilty of robbery beyond a reasonable doubt, substantial evidence supports the robbery conviction. (See *Hill*, *supra*, 17 Cal.4th at pp. 848, 850 [that evidence could be consistent with other possible scenarios was irrelevant where there was substantial evidence from which a rational trier of fact could have found that defendant robbed victim].)

## IV. *Trial Court's Refusal to Instruct the Jury with Sagote's Version of CALCRIM No. 706*

Sagote contends the trial court erred when it refused to give the version of CALCRIM No. 706 requested by the defense regarding the jury's consideration of a witness's punishment.

### A. *Trial Court Background*

Sagote's defense involved discrediting former codefendant Siliga's testimony by claiming that she had lied to avoid a harsher punishment. Evidence at trial relevant to this defense included Siliga's testimony that, before pleading guilty, she understood that she was facing life in prison without the possibility of parole, but, as a result of her plea

---

[20] Sagote suggests that May's friends could have retrieved her clothes for her, and notes that May was dressed when Officer Peachey spoke to her later that day. The evidence does not show whether or not May ultimately was able to get her clothes back. Moreover, even if she did somehow retrieve her clothing from the dumpster, that does not eliminate the substantial evidence of Sagote's intent to permanently deprive May of her clothing.

agreement, she expected to be sentenced to 14 years and 4 months in prison. She also testified that wanting to see her children again outside of prison while they were still relatively young was a consideration in entering the plea agreement. On cross-examination, Siliga acknowledged that, during her interview with police, she initially lied. However, she became afraid of receiving the death penalty and never seeing her children again, which caused her to ultimately tell the truth about what had happened to May.

To permit the jury to consider this evidence during its deliberations, both the prosecution and the defense submitted proposed modifications to CALCRIM No. 706.[21] Both proposed modifications added the words "as to the defendant" to the standard instruction, to preclude the jury from considering penalty or punishment with respect to Sagote. Defense counsel suggested also adding the following language: "[H]owever, you may consider and discuss penalty or punishment when assessing the credibility of the witness, [Siliga]." The prosecutor's suggestion included the following language: "[H]owever, in assessing the credibility of Siliga, you may consider as one factor any promises of immunity or leniency in exchange for her testimony." (See CALCRIM No. 226 [which similarly states that questions jurors may consider in evaluating a witness's testimony include, "Was the witness promised immunity or leniency in exchange for his or her testimony?"].)

The trial court stated that it preferred the prosecution's proposed modification "because I don't want the jury to consider relative penalty or punishment in terms of sentencing decisions as to either the defendant or Siliga in terms of assessing the evidence, but it is entirely proper for them to consider whether they should believe Siliga or not in terms of the promises that she's been given that pertain directly to how she is going to be punished. [¶] So I think the People's formulation creates less potential for jury [*sic*] engaging in improper discussion.

---

[21] CALCRIM No. 706, without modification, states: "In your deliberations, you may not consider or discuss penalty or punishment in any way when deciding whether a special circumstance, or any other charge, has been proved."

The court therefore overruled defense counsel's objection to the prosecution's instruction and instructed the jury with a modified version of CALCRIM No. 706, as follows: "In your deliberations, you may not consider or discuss penalty or punishment in any way when deciding whether a special circumstance, or any other charge, has been proved as to the defendant.

"However, in assessing the credibility of Siliga, you may consider as one factor, any promises of immunity or leniency in exchange for her testimony."

## B. *Legal Analysis*

The trial court has a sua sponte obligation to instruct the jury with CALCRIM No. 706 because " '[a] defendant's possible punishment is not a proper matter for jury consideration. [Citation.]' " (*People v. Thomas* (2011) 51 Cal.4th 449, 486.) In addition, a defendant is entitled, upon request, to an instruction that pinpoints the theory of the defense. (*People v. Hughes* (2002) 27 Cal.4th 287, 361, citing *People v. Saille* (1991) 54 Cal.3d 1103, 1119.) A court may, however, refuse a proffered instruction if it is an incorrect statement of law, duplicative, argumentative, or might confuse the jury. (*People v. Gurule* (2002) 28 Cal.4th 557, 659.)

We conclude the court did not err in giving the instruction it did. Both suggested versions of the pinpoint instruction essentially told the jury it could consider the possible effect Siliga's decision to enter a plea agreement for a lesser sentence might have had on her credibility, and hence on her testimony. The language of Sagote's proposed instruction, however, also allowed the jury to "consider and discuss penalty or punishment" without limitation when assessing Siliga's credibility, which the jury could have understood to mean it could consider and compare the potential punishments of both Sagote and Siliga. Thus, the court properly refused to give Sagote's modified version of CALCRIM No. 706 because it could have confused the jury in a way in which the prosecution's similar proposed instruction did not. (See *People v. Gurule*, *supra*, 28 Cal.4th at p. 559; compare *People v. Jones* (2003) 30 Cal.4th 1084, 1114 [instructions barring discussion of a defendant's punishment "do not prohibit a juror from considering the punishment the accomplices faced and what they actually received in assessing the

33

credibility of their testimony"]; *People v. Pitts* (1990) 223 Cal.App.3d 606, 880 [trial court erred in refusing to instruct jury "not to consider punishment as to defendants, but that it could be considered with regard to any witness who had charges pending at the time he or she testified, or who was on probation"].)

## V. *Admission of Evidence of Prior Uncharged Offenses*

Sagote contends the trial court abused its discretion and violated her due process rights when it admitted evidence of prior uncharged offenses.

## A. *Trial Court Background*

The prosecution moved in limine, pursuant to Evidence Code section 1101, subdivision (b), to introduce evidence of uncharged offenses at trial that would demonstrate Sagote's plan to make money through drug sales, to demonstrate a common plan or scheme, identity, modus operandi, and intent. The prosecutor argued that "[p]art of that scheme is to extort drug debts in a violent fashion to maintain her status as a feared drug dealer in the Tenderloin." In particular, the prosecution requested that evidence be admitted regarding collection of drug debts, including evidence of "loan sharking" activities involving Abrams, Byron (aka "Shorty"), Burnell Williams (aka "Unique Roberts"), "Kizzy," and "Skates."

Both in an earlier motion to exclude character evidence and in response to the prosecution's motion, defense counsel objected to admission of this evidence, primarily on the grounds that (1) none of the prior offenses were sufficiently similar to the present matter to prove any issue of fact, and (2) the evidence's probative value was substantially outweighed by its prejudicial effect and undue consumption of time, pursuant to Evidence Code section 352.

At a hearing on the admissibility of evidence regarding these prior incidents, the court expressed its belief that the incidents "seem to share certain common features. And if there is anything that I see that runs through these things, they are a couple: One is the relationship to drug dealing in a confined area of the Tenderloin in San Francisco; secondly, a debt, drug related; third, use of a weapon, or some form of physical violence; five, [*sic*] false imprisonment; and, six, stripping of clothes. [¶] Now, all of these

34

different things are not present in all, but they show up in all these incidents in various combinations." The court explained that it was inclined to admit the evidence "under a theory that identity is an issue here. And there is also potentially a common scheme or plan that stands out in my mind. And I think that there is enough uniqueness here to permit introduction under [Evidence Code section 1101, subdivision (b)]."

Defense counsel argued that the evidence should not be admitted due to the lack of similarity between the incidents in question and the charged offense of murder. The court noted that Sagote was charged, not only with murder, but with robbery and kidnapping, and that the prosecution had to prove the special circumstance that the homicide was committed during the commission of a kidnapping.

The court first ruled that it would exclude evidence of Sagote's numerous drug-related and other arrests, pursuant to Evidence Code section 352. The court then exercised its discretion to admit the "Abrams, Byron, Kizzy and the Skates incidents," subject to Siliga—who was expected to testify to witnessing some of those incidents—demonstrating that she had personal knowledge of those incidents. The court detailed its reasons for admitting the evidence: "The reason why I am exercising my discretion to let in Abrams, Byron and Kizzy and Skates incidents, number one, they are not remote in time. In the Abrams incident you have the use of a vehicle, the moving of the person to an area close to where the homicide occurred, the person being taken from one area and deliberately left in another area, and the threat.

"In terms of Byron, you have the use of a vehicle; you have [an] area close in proximity to the Tenderloin, South of Market. And, with Abrams, it concerns a drug debt.

"With Kizzy it's a drug debt; you are taking the person in a vehicle to an area south of the canal, Mission Rock. It's remote for the most part, you know, industrial area; person is being stripped and then they are being abandoned in the area when Sagote drives off.

"Lastly, in terms of Skates, it's a drug debt, person stripped nude, and they are being searched for money or drugs."

35

As to Roberts, the court tentatively ruled that evidence of that incident would not be admitted because, from what it knew, "there is a drug debt, there is an assault, there is a stick and someone else joins in to assist Sagote, and he gets a fractured jaw. So it doesn't have the transportation, the vehicle, the stripping that I mentioned earlier." Because Roberts had not been found, the court "reserve[d] the right" to reconsider if more information became available about that incident.

Several weeks later, the court revisited the admissibility of the Roberts evidence, noting that it was "a closer call" than the other prior uncharged offenses in that, "while it does involve an assault, there is an injury, and it's in the Tenderloin[,] [t]here isn't the movement, the motor vehicle and stripping somebody naked." The court concluded that this "should come in in the People's case in chief, because not only is Sagote's identity an issue, and also, of course, her intent for the variety of the charges in the information, but I think arguably this is part of a common scheme or plan . . . with regard to those people who owe Sagote money for drugs being purchased on credit. And the level of uniqueness or similarity, of course, is different than if identity was the only issue." Discussing prejudice under Evidence Code section 352, the court further stated that evidence that Sagote and another person struck Williams with a stick and broke her jaw, "certainly when you compare it to the other injury [i.e., the charged murder], I don't think it is unduly inflammatory . . . ."[22]

During trial, as set forth earlier in this opinion, Abrams and Roberts testified about the incidents in which they were victimized by Sagote, and Siliga testified about the incidents involving Shorty, Kizzy, and Skates. (See Factual Background, *ante*.)

The court instructed the jury with CALCRIM No. 375, as follows: "The People presented evidence that the defendant committed other offenses that were not charged in this case.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged

_____

[22] The court later denied Sagote's motion for new trial on this issue.

offenses.  Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged  offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

"The defendant was the person who committed the offenses alleged in this case; or

"The defendant acted with the intent required to prove the offenses in counts I-II; or

"The defendant had a motive to commit the offenses alleged in this case; or

"The defendant had a plan or scheme to commit the offenses alleged in this case;

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses.

"Do not consider this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of the charged offenses or that the allegations have been proved.  The People must still prove each charge and allegation beyond a reasonable doubt."

### B.  *Legal Analysis*

"Evidence Code section 1101, subdivision (a) prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.  Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition."  (*People v. Ewoldt*

37

(1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Hence, under subdivision (b) of section 1101, evidence that a person committed a prior uncharged offense is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

"In determining whether evidence of uncharged misconduct is relevant to demonstrate a common design or plan, it is useful to distinguish the nature and degree of similarity (between uncharged misconduct and the charged offense) required in order to establish a common design or plan, from the degree of similarity necessary to prove intent or identity. [¶] The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . [¶] A greater degree of similarity is required in order to prove the existence of a common design or plan. . . . [I]n establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.] . . .

"To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]

"The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.

38

[Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*Ewoldt*, *supra*, 7 Cal.4th at pp. 402-403, fn. omitted.)

If the trial court determines that the "evidence of prior conduct is sufficiently similar to the charged crimes to be relevant to prove the defendant's intent, common plan, or identity, the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.' [Citation.]" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*); see also *People v. Sullivan* (2007) 151 Cal.App.4th 524, 559 (*Sullivan*) [prejudice referred to in Evidence Code section 352 " ' " 'applies to evidence which uniquely tends to evoke an emotional bias against . . . [one party] as an individual and which has very little effect on the issues' " ' "].)

We review a trial court's ruling pursuant to Evidence Code sections 1101, subdivision (b), and 352 under the deferential abuse of discretion standard. (*Foster*, *supra*, 50 Cal.4th at pp. 1328-1329.)

Here, Sagote "concede[s] that some evidence of what Sagote did to persons who did not pay her may have been relevant to the charge that Sagote robbed May on January 11, 2007." Thus, Sagote does not challenge the admissibility of the evidence regarding three of the prior incidents. This evidence includes, first, the incident in which Sagote drove to the Tenderloin, told Abrams to get into her car, drove to an isolated location while asking for money Abrams owed her, then physically intimidated Abrams, threatened her, and left her behind. In the second incident, Sagote and her boyfriend drove to the Tenderloin, where Sagote told Shorty and Kizzy to get in the car, asked for money that Shorty—one of her workers—owed her, took them to an isolated location, told them to get undressed, threw their clothes far away, and drove off without them. In the third incident, Sagote approached a man named Skates, who also sold drugs for Sagote in the Tenderloin and owed her money; told him to undress; and then made him bend over and cough before throwing his clothes in the middle of the street.

39

Sagote argues, however, that the evidence regarding the two other incidents involving Shorty and Roberts was unduly prejudicial and should not have been admitted because "[t]he sole purpose and effect of this testimony was to paint Sagote as a dangerous and violent person who might inflict extreme pain and punishment on those who did not pay their debts."

With respect to the evidence regarding the Shorty incident, Siliga testified that, in 2006, Sagote drove with Siliga to the Tenderloin in her two-door compact car and picked up Shorty, who again owed Sagote money. Sagote drove to an alley south of Market Street, where she punched Shorty multiple times before he got out of the car with lumps and bruises on his face. Sagote then drove away and left him there.

We find that the court did not abuse its discretion when it found this evidence was relevant to show Sagote's common scheme or plan. There were significant similarities between the incident with Shorty and the incident with May, as well as the other prior incidents. All of this evidence involved people who sold drugs for or bought drugs from Sagote on credit in a certain part of the Tenderloin, who also owed her money. The evidence also showed that Sagote used a strategy of intimidation, humiliation, and violence to induce fear and compliance in those who worked for her or owed her money for drugs. As Sagote stated in her interview with police, in response to the question regarding why people would falsely accuse her of killing May over a small debt, Sagote replied, "Because I talk crazy to people, I don't let people disrespect me . . . ."

In particular, both the challenged evidence regarding Shorty and the current offenses involved people in the same Tenderloin area who owed Sagote money for drugs, though in May's case, the debtor was apparently her boyfriend. Sagote initially stripped each of them and later escalated by driving them in her car, in the company of Siliga, to a remote location, where she physically harmed them before driving away, leaving them behind. "These common features manifest the same general plan, and therefore support a finding that [Sagote] acted in accordance with that plan." (*Foster*, *supra*, 50 Cal.4th at p. 1329.) Although the second incident with May seems to have been based, at least in part, on May's making a police report against her, both incidents involved Sagote

dominating and punishing people who had crossed her or disrespected her in her Tenderloin drug-dealing and loan sharking business.[23] Thus, while there were some differences between the current offense and the Shorty incident, there were enough common features for the Shorty incident, along with the other unchallenged evidence, to "indicate the existence of a plan rather than a series of similar spontaneous acts." (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.)

We further find that the trial court reasonably concluded that the Shorty evidence was not subject to exclusion under Evidence Code section 352. Our Supreme Court has set forth a number of relevant factors that must be considered when determining whether the prejudicial effect of evidence of prior uncharged offenses outweighs its probative value: "(1) whether the inference created by the evidence is strong; (2) whether the source of evidence concerning the present offense is independent of and unaffected by information about the uncharged offense; (3) whether the defendant was punished for prior misconduct; (4) whether the uncharged offense is more inflammatory than the charged offense; and (5) whether the two incidents occurred close in time." (*Sullivan*, *supra*, 151 Cal.App.4th at p. 559, citing *Ewoldt*, *supra*, 7 Cal.4th at pp. 404-405.)

In the present case, as discussed, the Shorty evidence, together with the unchallenged prior offense evidence, was quite probative on the issue of common scheme or plan. Also, while the source of the evidence concerning the Shorty incident was Siliga, who also was involved in the present offense, and while Sagote apparently was not punished for the Shorty offense, the two incidents occurred within a year of each other. Moreover, the present offense, in which May was killed after being doused with gasoline and set on fire, is inarguably more inflammatory than the prior incident in which Shorty had lumps and bruises on his face after being punched. (See *Sullivan*, *supra*, 151 Cal.App.4th at p. 559.)

---

[23] We disagree with Sagote that, because of the evidence that Sagote was retaliating against May for filing a police report, the Shorty evidence was "entirely cumulative" to other evidence showing the "strong methods" Sagote used to collect her debts.

41

The trial court also gave the jury a limiting instruction, which ensured that it would not use the prior uncharged offense evidence for any improper purpose. (See *People v. Rogers* (2013) 57 Cal.4th 296, 332.) The instruction informed the jury that it could consider this evidence for the limited purpose of deciding whether, inter alia, Sagote "had a plan or scheme to commit the offenses alleged in this case," and further told the jury that it could "not consider this evidence for any other purpose."[24] (See CALCRIM No. 375.) We presume the jury followed the court's instruction. (See *People v. Jones* (2011) 51 Cal.4th 346, 371.)

In sum, the trial court did not abuse its discretion in concluding that the Shorty evidence was relevant to prove Sagote's plan, or in finding that the probative value of that evidence was not outweighed by the danger of undue prejudice. (See § 352; *Foster*, *supra*, 50 Cal.4th at pp. 1328-1329.)

The Roberts evidence is, as the trial court stated, "a closer call" than the other prior uncharged offense evidence. Like the present offense and the challenged Shorty incident, it involved an assault that resulted in injury, on a person in the Tenderloin who

---

[24] The trial court also instructed the jury that it could consider this evidence to prove identity, intent, or motive. Because evidence of the prior uncharged offenses was admissible to prove Sagote's plan, "regardless of whether it is also relevant to prove [her intent, motive, or] identity as the perpetrator, we need not decide whether the evidence was also admissible to prove [intent, motive, or] identity." (*Foster*, *supra*, 50 Cal.4th at p. 1329.)

In *Foster*, in which the trial court instructed the jury on intent, plan, and identity, our Supreme Court concluded that it did not have to "decide whether the prior crimes were sufficiently similar to the charged offenses to be relevant to the issue of identity, because any error in the court's instruction was harmless. [Citation.] As noted above, the evidence was *admissible*, regardless of whether it was relevant to the issue of identity. Thus, the jury would have heard this evidence even if the trial court had not admitted it to establish defendant's identity as the perpetrator." (*Foster*, *supra*, 50 Cal.4th at p. 1333, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) The court further found that overwhelming evidence established that the defendant was, in fact, the perpetrator of the charged crimes. (*Ibid.*)

Here, we find that any error in instructing the jury on use of the Shorty evidence to prove identity, motive, and intent was similarly harmless. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

42

sold drugs for Sagote and owed her money. The evidence thus was indicative of Sagote's ongoing plan to control, intimidate, and punish people who owed her money. The incident did not, however, involve transporting the victim in a car to a remote location, as did the present offense and the Shorty incident.

As a whole, we believe that the Roberts evidence, like the other prior offense evidence, did tend to show that Sagote had a common plan to harm people who disrespected her or challenged her authority, both to punish them and make an example of them, i.e., to keep in line others in the Tenderloin to whom she sold drugs on credit. (See *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1225 ["even with respect to the comparatively higher degree of similarity required for the use of other-crimes evidence to establish 'common scheme or plan,' the standard can be met despite the existence of some factual differences between or among the charged offenses"].) On the other hand, our Supreme Court has cautioned that, " 'in the event of uncertainty as to [the] connection [of uncharged offense evidence] with the offense charged "the doubt should be resolved in favor of the accused." [Citation.]' [Citation.]" (*People v. Holt* (1984) 37 Cal.3d 436, 451; accord, *People v. Jefferson* (2015) 238 Cal.App.4th 494, 504.)

We need not definitively decide whether the differences between the Roberts incident and the current offenses precluded admission of the evidence regarding that incident under Evidence Code sections 1101, subdivision (b), and 352 because we conclude that its admission did not prejudice Sagote. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Roberts's testimony was relatively brief, taking up only 37 pages of reporter's transcript in the context of a lengthy trial. The trial court also limited the prejudicial impact of this evidence when it instructed the jury that (1) it was to consider the similarity or lack of similarity between uncharged and charged offenses when it evaluated the evidence, and (2) the evidence was not admissible to prove that Sagote had a bad character or was predisposed to commit crimes. (See *People v. McDermott* (2002) 28

43

Cal.4th 946, 999; CALCRIM No. 375.)[25] Moreover, although Roberts was injured and had her jaw broken during the prior offense, that injury pales in comparison to the horrendous injuries and death suffered by May. (See *Sullivan*, *supra*, 151 Cal.App.4th at p. 559; Evid. Code, § 352.)

In addition, the evidence of Sagote's guilt was extremely strong. First, regarding the January 11 robbery, Mark Shirley testified about seeing May taking off her clothes and handing them to a woman who looked like Sagote. He then saw the woman throw May's clothes in a dumpster. Abrams also testified that Sagote had acknowledged stripping May and throwing her clothes in a garbage can. Siliga's detailed testimony about the events of January 12 was corroborated by the testimony of Tina Irwin, who saw Siliga pushing May into the back of a small two-door car while a second woman sitting in the driver's seat pulled her inside.[26] The adopted admissions evidence also pointed to Sagote's guilt, as did the evidence of the uncharged offenses Sagote committed against Abrams, Shorty, Kizzy, and Skates. There was also evidence that May had reported a robbery shortly before she was murdered, and Sagote admitted that May had previously been in her car, supposedly to go to the police station to confirm that Sagote had not robbed her.

There was additional evidence admitted at trial indicating that Sagote bought the gas can found at the scene when she stopped for gas on the way to Candlestick Point. Moreover, a sock found at the scene matched a sock found in Sagote's car. Finally, cell

---

[25] As with the challenged Shorty evidence (see fn. 24, *ante*), we find that any error in instructing the jury on use of the Roberts evidence to prove identity, intent, or motive was harmless. (See *Foster*, *supra*, 50 Cal.4th at p. 1333; *Watson*, *supra*, 46 Cal.2d at p. 836.)

[26] Sagote makes much of the fact that Irwin testified that she saw May being forced into a car similar to Sagote's by Siliga and another woman shortly after 11:00 a.m., rather than shortly after 9:00 a.m., as Siliga testified and as supported by evidence of Sagote's cell phone usage. Given many similarities between Irwin's testimony and that of Siliga, it would be logical to assume that Irwin was simply mistaken about the time at which she saw May being forced into the car. Sagote's attempt to use Irwin's time estimate to claim that it could not have been Sagote and Siliga forcing May into the car is not persuasive.

phone data showed that Sagote's cell phone was in the Tenderloin and Candlestick Point areas at times corresponding to Sagote's alleged movements on January 12, 2007.

Accordingly, in light of the vastly more horrifying nature of the present offense; the minimal amount of time presentation of this evidence took; the court's limiting instruction on the prior offense evidence; and the strong, multi-layered evidence of Sagote's guilt, we conclude any error in admission of Roberts's testimony was harmless. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)[27]

**DISPOSITION**

The judgment is affirmed.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Miller, J.

---

[27] Sagote also asserts, with minimal argument, that admission of the prior offense evidence violated her constitutional rights to due process and a fair trial. We have already explained that evidence of the beating of Shorty was admissible and that the Roberts evidence was, even if improperly admitted, neither inflammatory nor likely to affect the result in this case. Hence, because admission of this evidence did not "infect[] the entire trial" or render it fundamentally unfair, Sagote has not demonstrated a violation of her constitutional rights. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Partida* (2005) 37 Cal.4th 428, 436.)

45